## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL 178 HEALTH & WELFARE TRUST FUND, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> ACTAVIS HOLDCO U.S., INC., TEVA PHARMACEUTICALS USA, INC., TEVA PHARMACEUTICAL INDUSTRIES LTD., MYLAN INC., MYLAN PHARMACEUTICALS INC., UDL LABORATORIES, INC., ENDO INTERNATIONAL PLC; PAR PHARMACEUTICAL HOLDINGS, INC., QUALITEST PHARMACEUTICALS, INC., HERITAGE PHARMACEUTICALS INC., BRECKENRIDGE PHARMACEUTICAL, INC., UPSHER-SMITH LABORATORIES, INC., and ROUSES POINT PHARMACEUTICALS, LLC, <br><br> Defendants. | Case No. _____ <br><br> **CLASS ACTION COMPLAINT** <br> **JURY TRIAL DEMANDED** |

Plaintiff Plumbers & Pipefitters Local 178 Health & Welfare Trust Fund ("Plaintiff" or "Local 178"), on behalf of itself and all others similarly situated, against: Defendants Actavis Holdco U.S., Inc.; Teva Pharmaceuticals USA, Inc.; Teva Pharmaceutical Industries Ltd.; Mylan Inc.; Mylan Pharmaceuticals Inc.; UDL Laboratories, Inc.; Defendant Endo International PLC, Par Pharmaceutical Holdings, Inc., and Qualitest Pharmaceuticals, Inc. (collectively defined below as "Endo"); Heritage Pharmaceuticals Inc.; Breckenridge Pharmaceutical, Inc.; Upsher-

1

Smith Laboratories, Inc., and Rouses Point Pharmaceuticals, LLC (collectively, the "Defendants") alleges:

## INTRODUCTION

1.       Plaintiff brings this action on behalf of itself and on behalf of all persons and entities in the United States and its territories who purchased, paid, and/or provided reimbursement for some or all of the purchase price of generic propranolol tablets and capsules (collectively, "Propranolol") marketed and sold by Defendants during the periods commencing not later than March 18, 2015 and April 18, 2013, respectively, and continuing to the present.

2.       Propranolol is the generic version of Inderal. The U.S. Food and Drug Administration approved Inderal, developed by Wyeth Pharmaceuticals, Inc., in 1967.

3.       Propranolol is a beta-blocker. Beta-blockers affect the heart and circulation (blood flow through arteries and veins). Propranolol is used to treat tremors, angina (chest pain), hypertension (high blood pressure), heart rhythm disorders, and other heart or circulatory conditions. It is also used to treat or prevent heart attack and to reduce the severity and frequency of migraine headaches. Propranolol is reportedly the highest-selling beta-blocker as measured by prescriptions.

4.       As alleged below, Defendants' scheme injured Plaintiff and the Classes of indirect purchasers it seeks to represent (as defined below), causing them to pay overcharges. Plaintiff seeks to recover these overcharges and seeks other relief arising out of Defendants' conspiracy to charge supra-competitive prices for: (1) Propranolol capsules during the period from April 18, 2013 to the present ("Propranolol Capsules Class Period"), and (2) for Propranolol tablets during the period from March 18, 2015 to the present ("Propranolol Tablets Class Period") (both class periods are referred to collectively as the "Class Periods").

2

5.      Beginning on or around April 2013, contrary to past practice, Defendants caused the average price of Propranolol capsules sold in the United States to increase substantially. The increases were the result of an agreement among Defendants to increase prices and restrain competition for the sale of Propranolol capsules in the United States. The agreement was furthered by discussions held at Generic Pharmaceutical Association ("GPhA") meetings, including a meeting in Orlando, Florida from February 20-23, 2013 that was attended by Defendants.

6.      Defendants Mylan, Actavis, Breckenridge, Rouses, and Upsher-Smith sold generic Propranolol capsules during the Propranolol Capsules Class Period. Prior to April 2013, the average amount in the U.S. paid for generic Propranolol capsules was stable. Within a few weeks of the February 20-23, 2013 GPhA meeting, the average prices for generic Propranolol capsules increased by extraordinary amounts. Prices for Propranolol capsules remained at supra-competitive levels throughout the Propranolol Capsules Class Period.

7.      Similarly, beginning on or around March 18, 2015, contrary to past practice, Defendants caused the average price of generic Propranolol tablets sold in the United States to dramatically increase. The increases were the result of an agreement among Defendants to increase prices and restrain competition for the sale of generic Propranolol capsules in the United States. The agreement was furthered by discussions held at GPhA meetings, including a meeting in Miami Beach, Florida in February 9-11, 2015 that was attended by Defendants.

8.      Defendants Mylan, Actavis, Teva, Endo, and Heritage sold generic Propranolol tablets during the Class Period. Prior to March 2015, the average amount in the U.S. paid for generic Propranolol tablets was stable. Within a few weeks of the February 2015 GPhA meeting, the average prices for generic Propranolol tablets increased by extraordinary amounts. Prices for

generic Propranolol tablets remained at supra-competitive levels throughout the Propranolol tablets Class Period.

9.      During the Class Periods, there was no significant increase in the costs of making Propranolol, no significant decrease in supply, and there was no significant increase in demand. Nonetheless, there were extraordinary increases by the Defendants in the prices they charged their customers for generic Propranolol. Such price increases in a commodity product for which there were no significant increases in costs or demand, or significant decrease in supply, would not have been in each Defendant's unilateral self-interest absent the existence of a cartel.

10.      These and other recent precipitous price hikes by drug manufacturers for generic drugs have prompted extensive scrutiny by the press, the United States Congress, and federal and state antitrust regulators. In 2014, the Antitrust Division of the United States Department of Justice ("DOJ") commenced a wide-ranging criminal investigation of this broad conspiracy and caused grand jury subpoenas to be issued to various generic drug manufacturers in connection with this investigation.[1] In July 2014, the State of Connecticut likewise initiated an investigation into suspicious price increases for certain generic pharmaceuticals, in coordination with other states. The information developed through that multi-state investigation, which is still ongoing, has uncovered evidence of a broad, well-coordinated, and long-running series of schemes to fix the prices and allocate markets for various generic drugs in the U.S.

11.      In December of 2016, 20 states filed a civil complaint against, *inter alia*, Heritage Pharmaceuticals Inc., Mylan Pharmaceuticals Inc. and Teva Pharmaceuticals USA, Inc., each of whom are named defendants in this case. The complaint charged these companies with "entering

---

[1] The investigation encompasses a number of generic drugs and, as the scope of the states' and the DOJ's investigations are further clarified, Plaintiff reserves the right to amend its complaint to add more parties and/or claims.

into contracts, combinations and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices and reducing competition in the markets for Doxycycline Hyclate Delayed Release […] and Glyburide in the United States." In an interview, George C. Jepsen, Connecticut's attorney general, stated that "[…]this is just the tip of the iceberg […] our investigation is continuing, and it goes way beyond the two drugs in this lawsuit, and it involves many more companies than are in this lawsuit."[2]

12.     These extraordinary price increases were not the result of supply shortages, demand spikes, or other market conditions. Rather, they were the result of Defendants' coordinated and collusive efforts and agreement, which violate the Sherman Act (15 U.S.C. § 1, *et seq.*), as well as state antitrust, consumer protection, and common laws.

13.     As a result of Defendants' unlawful conduct, Plaintiff and the other members of the proposed Classes paid artificially inflated prices during the Class Periods that exceeded the amount they would have paid if a competitive market had determined the prices for generic Propranolol, and the Defendants realized more revenue and profits than they would have received if a competitive market had determined the prices for generic Propranolol.

**PARTIES**

14.     Plaintiff Plumbers & Pipefitters Local 178 Health & Welfare Trust Fund ("Local 178" or "Plaintiff"), located in Springfield, Missouri, is a local union that provides health care and other benefits to its members who reside in Missouri as well as other locations throughout the United States, through its not-for-profit trust fund. Local 178 indirectly purchased generic Propranolol during the Class Period as defined below, and was injured in its business or property by reason of the violations of law alleged herein. For prescriptions of generic drugs, such as

---

[2] http://www.nytimes.com/2016/12/15/business/generic-drug-price-lawsuit-teva-mylan.html.

Propranolol manufactured by one or more Defendants, the employee plan participant typically pays a portion of the cost of the prescription. Participating pharmacies collect the co-payment from the employee plan participant and bill Local 178 for the remaining cost of the Propranolol purchases.

15.     Defendant Actavis Holdco U.S., Inc. ("Actavis") is a Delaware corporation that has its administrative headquarters in Parsippany-Troy Hills, New Jersey. In 2012, Watson Pharmaceuticals acquired then-Switzerland-based Actavis Group to form Actavis plc, later known as Allergan plc after Actavis plc acquired Allergan Inc. in 2015. In August 2016, Teva Pharmaceutical Industries Ltd. acquired Allergan plc's generic pharmaceutical business for $40.5 billion. Actavis Holdco U.S., Inc. was among the Allergan plc generic pharmaceutical entities acquired by Teva in 2016. During the Class Periods, Actavis marketed and sold generic Propranolol in this District and throughout the United States.

16.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454. Teva USA is a wholly owned subsidiary of Defendant Teva Pharmaceutical Industries Ltd. During the Propranolol Tablets Class Period, Teva USA marketed and sold generic Propranolol tablets in this District and throughout the United States.

17.     Defendant Teva Pharmaceutical Industries Ltd. ("Teva Israel") has its principal place of business in Petah Tikva, Israel. During the Class Period, Teva Israel, through its subsidiary Teva USA, marketed and sold generic Propranolol tablets to customers in this District and other locations in the United States.

18.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business at 1000 Mylan Blvd., Canonsburg, Pennsylvania 15317. The parent corporation of

Mylan Inc. is Mylan N.V., a Netherlands corporation with global headquarters in Hertfordshire, U.K., and in Canonsburg, Pennsylvania. During the Class Periods, Mylan Inc. marketed and sold generic Propranolol in this District and throughout the United States through its subsidiaries, Mylan Pharmaceuticals Inc. and UDL Laboratories, Inc.

19.     Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505. During the Class Periods, Mylan Pharmaceuticals Inc. marketed and sold generic Propranolol in this District and throughout the United States.

20.     Defendant UDL Laboratories, Inc. ("UDL") is an Illinois corporation with its principal place of business at 1718 Northrock Ct, Rockford, Illinois 61103. UDL is, and was throughout the Class Period, a subsidiary of Mylan Inc. During the Propranolol Tablets Class Period, UDL marketed and sold generic Propranolol tablets in this District and throughout the United States.

21.     In this complaint, Defendants Mylan Inc., Mylan Pharmaceuticals Inc. and UDL will be referred to collectively as "Mylan." Mylan maintains an office at 405 Lexington Avenue, New York, New York 10174.

22.     Defendant Endo International PLC ("Endo International") is an Irish corporation with its principal place of business located at First Floor, Minerva House, Simmonscourt Road, Ballsbridge, Dublin 4, Ireland. During the Propranolol Tablets Class Period, Endo International, through its subsidiary Qualitest Pharmaceuticals, Inc., marketed and sold generic Propranolol tablets in this District and throughout the United States.

23.     Defendant Par Pharmaceutical Holdings, Inc. ("Par"), is a Delaware corporation with its principal place of business at One Ram Ridge Road, Chestnut Ridge, New York 10977.

In September 2016, Endo International completed an acquisition of Par at which time it created a combined U.S. Generics segment that included Par and Qualitest, naming the segment Par Pharmaceutical, an Endo International Company. On information and belief, Qualitest merged into Par.

24.     Defendant Qualitest Pharmaceuticals, Inc. ("Qualitest") is an Alabama corporation with its principal place of business in Huntsville, Alabama. In 2010, Endo Pharmaceuticals acquired Qualitest for $1.2 billion. During the Propranolol Tablets Class Period, Qualitest marketed and sold generic Propranolol tablets in this District and throughout the United States.

25.     In this complaint, Defendants Endo International, Par and Qualitest will be referred to collectively as "Endo."

26.     Defendant Heritage Pharmaceuticals Inc. ("Heritage") is a Delaware corporation with its principal place of business at 12 Christopher Way #300, Eatontown, New Jersey 07724. During the Propranolol Tablets Class Period, Heritage marketed and sold generic Propranolol tablets in this District and throughout the United States. Heritage is a subsidiary of Emcure Pharmaceuticals Ltd., based in Pune, India.

27.     Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business at 1 Passaic Ave, Fairfield, New Jersey 07004. During the Propranolol Capsules Class Period, Breckenridge marketed and sold generic Propranolol capsules in this District and throughout the United States.

28.     Defendant Upsher-Smith Laboratories, Inc. ("Upsher-Smith") is a Minnesota corporation with its principal place of business at 6701 Evenstad Drive, Maple Grove, Minnesota

55369. During the Propranolol Capsules Class Period, Upsher-Smith marketed and sold generic Propranolol capsules in this District and throughout the United States.

29.     Whenever in this complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

30.     All acts alleged in this complaint to have been done by Defendants were performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of Defendants' business affairs.

## CO-CONSPIRATORS

31.     Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

32.     At all relevant times, each Defendant was an agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## JURISDICTION AND VENUE

33.     Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26), for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

34.     This action also includes claims under the antitrust, consumer protection, and common laws of various states for damages and equitable relief, as described in Counts Two through Four below.

35.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is also conferred upon this Court by 28 U.S.C. § 1367. Finally, jurisdiction is conferred upon this Court by the Class Action Fairness Act of 2005 ("CAFA"), which amended 28 U.S.C. § 1332 to add a new subsection (d) authorizing federal jurisdiction where "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." The $5 million amount-in-controversy and diverse-citizenship requirements of CAFA are satisfied here.

36.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.  Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here, where Teva is headquartered.

37. This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Generic Propranolol throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## INTERSTATE TRADE AND COMMERCE

38. The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

39. During the Class Period, Defendants sold substantial quantities of generic Propranolol in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

## FACTUAL ALLEGATIONS

**A.    The Generic Drug Industry**

40. Defendants manufacture, market, and sell, among other products, generic versions of branded drugs, including generic Propranolol, for which FDA approval can be sought only after the patent on the corresponding branded drug expires.

41. According to the FDA's Glossary, a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[3] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand name drug, the

---

[3]    FDA                Glossary,           available              at http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

generic version "can be expected to have equal effect and no difference when substituted for the brand name product." *Id*.

42.     A drug company seeking approval to market and sell a generic equivalent of a brand name drug must refer to the Reference Listed Drug ("RLD") in its Abbreviated New Drug Application ("ANDA"). *Id*. Once the FDA determines that a drug company's application contains sufficient scientific evidence establishing the bioequivalence of the product to the RLD, an applicant may manufacture, market, and sell the generic drug product, which provides a safe, effective, low-cost alternative to the American public. *Id*.

43.     Furthermore, the FDA will generally assign a Therapeutic Equivalence Code ("TE Code") of AB to those products it determines to be bioequivalent.[4] This coding system allows users to quickly determine important information about the drug product in question.[5] For example, the Food & Drug Administration ("FDA") states that "[p]roducts generally will be coded AB if a study is submitted demonstrating bioequivalence. Even though drug products of distributors and/or repackagers are not included in the List, they are considered therapeutically equivalent to the application holder's drug product if the application holder's drug product is rated AB."[6]

44.     The entire purpose of authorizing a generic drug industry in the United States was to encourage the manufacture of less expensive, non-branded substitutes for branded prescription drugs that either had no patent exclusivity or for which the patent exclusivity was expiring. Once

---

[4] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ ElectronicSubmissions/DataStandardsManualmonographs/ucm071713.htm.

[5] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm#TEC.

[6] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ ElectronicSubmissions/DataStandardsManualmonographs/ucm071713.htm.

the patent on a brand-name drug expires, generic manufacturers can move in, creating more competition and lower prices. In a January 2012 report, the GAO noted that "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[7] Economic literature in the healthcare market further confirms that competition by generic products results in lower prices for consumers. In the period before generic entry, a brand drug commands 100% of the market share for that drug and the brand manufacturer can set the price without the impact of competitive market forces. Once the first generic enters the market, however, a brand drug rapidly loses sales, on average 90% within a year. As more generic manufacturers enter the market, prices for generic versions of a drug predictably will continue to decrease because of competition among the generic manufacturers, and the loss of sales volume by the brand drug to the corresponding generic accelerates as more generic options are available to purchasers.

45.     Due to the sizable price differentials between branded and generic drugs, as well as other institutional features of the pharmaceutical industry, pharmacists liberally and typically substitute the generic drug when presented with a prescription for the branded drug. Since passage of the Hatch-Waxman Act (Pub. L. No. 98-417, 98 Stat. 1585 (codified at 15 U.S.C. §§ 355, 360cc; 35 U.S.C. §§ 156, 271)), every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

---

[7] http://www.gao.gov/assets/590/588064.pdf.

46.     According to a report by the Generic Pharmaceutical Association ("GPhA"), nearly 3.8 billion (88%) of the total 4.3 billion prescriptions dispensed in the U.S. in 2014 were filled using generic drugs.[8]

> There has been substantial consolidation in the generic drug industry recently. The result of the generic drug industry's consolidation has been an environment ripe for collusion and higher prices for consumers. Generic manufacturers merged as a partial reaction to the consolidation of the distributors, the logic being that generic manufacturers could exert leverage to charge higher prices if distributors were stripped of the option of negotiating lower prices with other generic manufacturers offering therapeutically equivalent drugs. Market consolidation has also resulted in more generic product lines being combined or discontinued, further reducing price competition.

**B.      Absent Collusion, Generic Drugs Should Lead To Lower Prices**

47.     Brand name drugs are typically patented and the patent owner can charge a monopoly price. After the patent expires, generic drugs enter the market. Generic drugs typically provide consumers with a lower cost alternative to brand name drugs while providing the same treatment. Specifically:

> A generic drug is the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use. Before approving a generic drug product, FDA requires many rigorous tests and procedures to assure that the generic drug can be substituted for the brand name drug. The FDA bases evaluations of substitutability, or "therapeutic equivalence," of generic drugs on scientific evaluations. By law, a generic drug product must contain the identical amounts of the same active ingredient(s) as the brand name product. Drug products evaluated as "therapeutically equivalent" can be expected to have equal effect and no difference when substituted for the brand name product.[9]

48.     Further, "[d]rug products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product." *Id.*

---

[8] http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[9]     FDA,  Generic  Drugs:  Questions  and  Answers,  available  at http://www.fda.gov/Drugs/ResourcesForYou/Consumers/QuestionsAnswers/ucm100100.htm.

49.     Generic versions of brand name drugs are priced significantly below the brand versions. Because of the price differentials, and other institutional features of the pharmaceutical market, generic versions are liberally and substantially substituted for their brand counterparts. In every state, pharmacists are permitted (and, in some states, required) to substitute a generic product for a brand product unless the doctor has indicated that the prescription for the brand product must be dispensed as written. States adopted substitution laws following the federal government's 1984 enactment of the Hatch-Waxman Act.

50.     A mature generic market, such as the market for Propranolol, has several generic competitors. Due to the fact that each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.[10] Over time, generics' pricing nears the generic manufacturers' marginal costs.

51.     Generic competition usually enables purchasers to purchase generic versions of the brand drug at a substantially lower price than the brand drug. Generic competition to a single blockbuster brand drug product can result in billions of dollars in savings to direct purchasers, consumers, insurers, local, state, and federal governments, and others. Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.

C.     **Consolidation of Generic Drug Market**

---

[10] See, e.g., FTC, AUTHORIZED GENERIC DRUGS: SHORT-TERM EFFECTS AND LONG-TERM IMPACT, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."); Congressional Budget Office, "How Increased Competition From Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry" (July 1998).

52.     The global market for generic pharmaceuticals has undergone substantial consolidation. Generic pharmaceutical leader Teva, for example, acquired Ivax Corporation for $7.4 billion in 2006, Ben Laboratories for $7.4 billion in 2008, and Ratiopharma – Germany's second largest generic drug producer – for $5 billion in 2010. In November 2012, Watson Pharmaceuticals acquired Actavis and adopted Actavis's name. In March 2015, Defendant Actavis merged with Allergan, and Defendant Teva acquired Actavis Generics in 2016. Defendant Endo acquired Qualitest Pharmaceuticals for $1.2 billion in 2010 and Defendant Par in 2016.

53.     As a result of the consolidation, Defendants dominate the U.S. generic Propranolol market.

**D.     Opportunities for Collusion**

54.     The DOJ is reportedly looking closely at trade associations. According to an intelligence report from Policy and Regulatory Report, a source that was given inside information by someone with knowledge of the government's generic pricing investigation, the DOJ is looking closely "at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."

55.     Generic drug manufacturers attend various industry trade shows throughout the year, including those hosted by the GPhA, National Association of Chain Drug Stores, Healthcare Distribution Management Association (now the Healthcare Distribution Alliance), and Efficient Collaborative Retail Marketing.

56.     At these various conferences and trade shows, representatives from Defendants have opportunities to interact with each other and discuss their respective businesses and

customers. Attendant with many of these conferences and trade shows are organized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity to meet with competitors outside of the traditional business setting. Of particular importance here, generic drug manufacturer representatives who attend these functions use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information.

57.     In short, these trade shows and customer conferences provide generic drug manufacturers with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States market for generic drugs.

58.     In addition to these frequent conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business. A large number of generic drug manufacturers, including several of the Defendants, are headquartered in close proximity to one another in New Jersey, eastern Pennsylvania, or New York, giving them easier and more frequent opportunities to meet and collude. In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."

59.     As a result of these various interactions, Defendants' sales and marketing executives are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often leads to agreements

among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

60.     Defendants routinely communicate and share information with each other about bids and pricing strategy. This can include forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

61.     Defendants also share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection and rebates. Generic drug manufacturers use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

**D.     Generic Propranolol Prices Soar**

62.     The GPhA is the "leading trade association for generic drug manufacturers and distributors, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry." GPhA was formed in 2000 from the merger of three industry trade associations: GPhA, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

63.     According to GPhA's website, "GPhA member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year." GPhA states that, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry and help secure the future of this vital pharmaceutical market segment. In addition, GPhA provides valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."

64.     Defendants each attended the GPhA Annual Meeting in Orlando, Florida on February 20-22, 2013.

65.     This meeting, as well as other industry gatherings referred to above, provided Defendants with opportunities to collude, and on information and belief, at these meetings Defendants agreed to increase pricing for Propranolol.

66.     Within a few weeks of the February 2013 GPhaA meeting, the average prices for Propranolol capsules began to increase by extraordinary amounts:

   a.   **Propranolol 60mg ER Capsules.** Between March 21, 2013 and July 23, 2014, average prices increased by 374%.

   b.   **Propranolol 80mg ER Capsules.** Between March 21, 2013 and September 17, 2014, average prices increased by 347%.

   c.   **Propranolol 120mg ER Capsules.** Between March 21, 2013 and July 23, 2014, average prices increased by 327%.

   d.   **Propranolol 160mg ER Capsules.** Between March 21, 2013 and October 22, 2014, average prices increased by 239%.

67.     The National Average Drug Acquisition Cost ("NADAC") is a pricing reference file published by the Centers for Medicare and Medicaid Services that is based on average actual acquisition costs of various outpatient drugs collected from a monthly survey of retail community pharmacies across the United States.

68.     The NADAC data for generic Propranolol capsules reveals a pattern of massive price increases beginning as early as 2013, and increasing tremendously in 2014, after which prices remained elevated well above their previous competitive levels to the present day.

69.    For example, the chart below, based on NADAC data, reveals a dramatic increase in the average per-unit price for generic Propranolol 60 mg ER capsules:



70. The NADAC data for generic Propranolol 80 mg ER capsules reveals a strikingly similar pattern:



71.    The NADAC data for generic Propranolol 120 mg ER capsules reveals a strikingly similar pattern:



72.     The NADAC data for Propranolol 160 mg ER capsules reveals a strikingly similar pattern:



73.     Defendants also attended the GPhA Annual Meeting in Miami Beach, Florida on February 9-11, 2015.

74.     Within a few weeks of the February 2015 GPhA meeting, the average prices for Propranolol tablets began to increase by extraordinary amounts:

        a.     **Propranolol 10mg Tablets.** Between February 18, 2015 and September 23, 2015, average prices increased 819%.

        b.     **Propranolol 20mg Tablets.** Between February 18, 2015 and November 18, 2015, average prices increased 892%.

        c.     **Propranolol 40mg Tablets.** Between February 18, 2015 and February 17, 2016, average prices increased 1008%.

       **d.**      **Propranolol 60mg Tablets.** Between February 18, 2015 and August 19, 2015, average prices increased 96%.

       **e.**      **Propranolol 80mg Tablets.** Between February 18, 2015 and November 18, 2015, average prices increased 958%.

75.    For example, the chart below, based on NADAC data, reveals a dramatic increase in the average per-unit price for generic Propranolol 10 mg tablets:



76.    The NADAC data for generic Propranolol 20 mg tablets reveals a strikingly similar pattern:



77.    The NADAC data for generic Propranolol 40 mg tablets reveals a strikingly similar pattern:



78.     The NADAC data for Propranolol 60 mg tablets reveals a strikingly similar pattern:



79.     The NADAC data for generic Propranolol 80 mg tablets reveals a strikingly similar pattern:



80.     There were no reasonable justifications for this abrupt shift in pricing, as Defendants' price increases were not necessitated by increased manufacturing costs, or research and development costs. Likewise, there were no shortages of Propranolol in the United States.

81.     Federal law requires drug manufacturers to report potential drug shortages to the FDA, the reasons therefor, and the expected duration of the shortage. No supply disruption was reported by Defendants with respect to Propranolol during the Class Periods.

82.     In a report dated April 21, 2015, Richard Evans, Scott Hinds and Ryan Baum at Sector & Sovereign Research concluded that: "A plausible explanation is that generic manufacturers . . . are cooperating to raise the prices of products whose characteristics (low sales due to either very low prices or very low volumes) accommodate price inflation."

83.     The abrupt shift in the pricing of generic Propranolol has had a devastating impact on customers. As noted in letters from members of Congress to generic drug manufacturers as part of a wide investigation into unexplained increases in generic drug prices:

This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to operate" and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability to purchase their needed medications. The NCPA survey found that "pharmacists reported patients declining their medication due to increased co-pays," and "84% of pharmacists said that the acquisition price/lagging reimbursement trend is having a 'very significant' impact on their ability to remain in business to continue serving patients."

84.    As a 2015 white paper published by Elsevier Clinical Solutions noted, this also has a detrimental impact on purchasers of the drugs:

High generic drug prices have had an adverse effect on almost everyone in the pharmaceutical supply chain. Consumers face higher co-pays and prices and health plans are dealing with higher drug spend. Physicians are finding the need to prescribe alternative drug therapies while dealing with angry patients. In some cases, consumers are declining their medications due to increased prices. Many pharmacies are receiving inadequate reimbursements and can lose money when drugs must be purchased at rapidly rising prices but reimbursed at lower predetermined rates.[11]

85.    And another 2015 white paper examining generic drug pricing, published by Wolters Kluwer, explained:

While the impact is being felt across the industry, small to mid-sized pharmacies can face notably greater challenges, as they do not have the resources, prescription volume, or affiliations with other purchasers that can empower them to bargain for discounts in a competitive marketplace. A survey conducted by the National Community Pharmacists Association (NCPA) revealed that pharmacy acquisition prices for many essential generic drugs have generally risen by between 600% and 1,000% in recent years. The same survey revealed that 84% of pharmacists at small or mid-sized pharmacies believed that increasing generic drug costs could result in unsustainable losses that would have a "very significant" impact on their ability to remain in business.[12]

---

[11] "The Impact of Rising Generic Drug Prices on the U.S. Drug Supply Chain," at pp. 1-2, available at http://www.ncpa.co/pdf/elsevier_wp_genericdrug.pdf.

[12] Donald J. Dietz, RPh, MS, and Fred Hamilin, "Generic Drug Pricing: Understanding the Impact," available at http://www.wolterskluwercdi.com/documents/white-papers/ms-generic-pricing-info.pdf.

86.     Defendants' adherence to their price-fixing scheme generated considerable profits. For example, in Endo's Q1 2015 earnings call on May 11, 2015, Endo CEO Rajiv De Silva stated "[i]n 2015, we expect strong double-digit revenue growth for U.S. Generics, as a result of consistent volume growth supplemented by recent pricing opportunities . . . ."

### E.      Congressional and Regulators' Responses to Rising Generic Drug Prices

87.     Defendants' dramatic and unexplained price hikes have engendered extensive scrutiny by the United States Congress and by federal and state antitrust regulators.

88.     On October 2, 2014, U.S. Senator Bernie Sanders and U.S. Congressman Elijah Cummings sent letters to several generic drug manufacturers, including Defendants Actavis, Endo, Heritage, Mylan, and Teva.

89.     On November 20, 2014, Senator Sanders's committee held a hearing entitled "Why Are Some Generic Drugs Skyrocketing In Price?" Various witnesses discussed the price increases for generic drugs. No chief executive of a generic drug manufacturer testified.

90.     At the Senate Hearing, Stephen W. Schondelmeyer, Professor of Pharmaceutical Management & Economics at the University of Minnesota testified concerning "signals of market failure" and noted that nearly 10% "of the widely used generic drug prices saw an annual price increase of 50% or more in 2013."

91.     Sanders and Cummings followed up on the Senate Hearing by writing a letter on February 24, 2015 to the Office of the Inspector General ("OIG") of the Department of Health & Human Services, asking it to investigate the effect that price increases of generic drugs have had on generic drug spending within the Medicare and Medicaid programs.[13]  The OIG responded in

---

[13] http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

a letter dated April 13, 2015, noting it planned to engage in a review of quarterly average manufacturer prices for the top 200 generic drugs from 2005 through 2014.[14]

92.     By November 3, 2014, the DOJ opened a wide-ranging grand jury investigation into the marketing and pricing practices of generic drugs, and has caused grand jury subpoenas to be issued to several generic drug manufacturers, including manufacturers of generic Propranolol.

93.     According to a June 26, 2015 report by the service Policy and Regulatory Report ("PaRR Report"):[15]

> A PaRR source says prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever. Like in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."

94.     On November 3, 2016, BLOOMBERG reported:

> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.

> Charges could extend to high-level executives, according to the people. The antitrust division, which has an immunity program to motivate wrongdoers to confess and inform on others, has stepped up its commitment to holding individuals responsible.

95.     Most recently, on November 7, 2016, the publication MLEX reported that the DOJ had received assistance from a leniency applicant beginning in the summer of 2016:

> While the Justice department didn't have a whistleblower at the beginning of the investigation, it is understood that this summer a company applied for leniency, which grants full immunity to the first company to come forward and admit to cartel violations. The company is understood to be privately held and hasn't publicly disclosed its involvement in the investigation.

---

[14] http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

[15] http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf

96.     The DOJ is poised to issue criminal indictments—and began that process earlier this month. On December 12, 2016, the DOJ charged Jeffrey Glazer, a former chief executive officer of Heritage Pharmaceuticals Inc., and Jason Malek, a former president of Heritage Pharmaceuticals Inc., with "knowingly enter[ing] into and engag[ing] in a combination and conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products, including doxycycline hyclate, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of doxycycline hyclate sold in the United States . . . [and] including glyburide, the primary purpose of which was to allocate customers and fix and maintain prices of glyburide sold in the United States."

97.     State attorneys general, led by the Connecticut Attorney General, have also pursued their own investigations, culminating most recently in a 20-state complaint charging Aurobindo Pharma USA, Inc., Citron Pharma, LLC, Heritage Pharmaceuticals Inc., Mayne Pharma (USA), Inc., Mylan, and Teva Pharmaceuticals USA, Inc. "with entering into contracts, combinations and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices and reducing competition in the markets for Doxycycline Hyclate Delayed Release ('Doxy DR') and Glyburide in the United States." The complaint notes that "the Plaintiff States have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors, which will be acted upon at the appropriate time." The complaint also details Mylan's role in both conspiracies, including Mylan's frequent communications with other competitors to facilitate and further their agreement to fix prices, which began "as early as 2013."

98.     In December 2015, Defendant Endo received Interrogatories and Subpoenas Duces Tecum from the Connecticut AG requesting information regarding pricing of certain of its generic products.

99.     On June 21, 2016, Teva received a subpoena from the DOJ seeking documents and other information relating to the marketing and pricing of certain of Teva's generic products and communications with competitors about such products. Defendant Actavis received a similar subpoena in June 2015.

100.    On July 12, 2016, Teva received a subpoena from the Connecticut AG seeking documents and other information relating to potential state antitrust law violations. Defendant Actavis has also received a similar subpoena from the Connecticut AG.

101.    On November 9, 2016, Mylan disclosed in its 10-Q report that it had received numerous federal and state subpoenas in conjunction with the marketing, pricing, and sale of generic drugs:

> On December 3, 2015, a subsidiary of Mylan N.V. received a subpoena from the Antitrust Division of the U.S. DOJ seeking information relating to the marketing, pricing, and sale of our generic Doxycycline products and any communications with competitors about such products.

> On September 8, 2016, a subsidiary of Mylan N.V., as well as certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products and any communications with competitors about such products. Related search warrants also were executed. . . . .

> On December 21, 2015, the Company received a subpoena and interrogatories from the Connecticut Office of the Attorney General seeking information relating to the marketing, pricing and sale of certain of the Company's generic products

(including Doxycycline) and communications with competitors about such products.[16]

102.    The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's ANTITRUST DIVISION MANUAL.[17]   Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.* Thus, the fact that the Defendants and certain of their employees received federal grand jury subpoenas is a strong indication that antitrust offenses have occurred.

103.    Commentators have also taken note of the criminal subpoenas. As reported on one legal website:

> The Justice Department's subpoenas focus on sharing and exchanging of pricing information and other issues among generic drug companies. The initial subpoenas, including two senior executives, suggest that the Justice Department

---

[16] https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdo c.htm.

[17] http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

has specific information relating to their participation in potentially criminal conduct. It is rare for the Justice Department to open a criminal investigation with specific subpoenas for individuals, along with company-focused subpoenas.

Given the breadth of such a potential cartel investigation, the Justice Department's inquiry of the generic pharmaceutical industry could be significant. The prices for a large number of generic drug prices have increased significantly over the last year. There does not appear to be any rational explanation for such increases involving a diverse set of products.

The scope of these price increases and the timing of them certainly raise serious concerns about collusive activity among competitors.[18]

104.    As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "[a] DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[19]

105.    Likewise significant is MLEX'S confirmation that a leniency applicant has sought amnesty from the DOJ. As the DOJ notes on its web site:[20]

**Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**

Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

---

[18] http://www.jdsupra.com/legalnews/criminal-global-cartel-focus-on-generic-92387/.

[19] https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

[20]http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program

106.    What is more, the leniency applicant must also satisfy the following condition, among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials." *Id.*

### FACTORS INDICATING GENERIC PROPRANOLOL MARKET'S SUSCEPTIBILITY TO COLLUSION

107.    Publicly available data on the generic Propranolol market in the United States demonstrates that it is susceptible to price-fixing by the Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) high barriers to entry; (3) lack of substitutes; (4) inelastic demand; (5) high degree of interchangeability, and (6) opportunities for contact and communication among competitors.

108.    **High Degree of Industry Concentration:** A concentrated market is more susceptible to collusion and other anticompetitive practices. The generic Propranolol market is highly concentrated and is dominated by a handful of companies. Therefore, elaborate communications, quick to be detected, would not have been necessary to enable pricing to be coordinated.

109.    **High Barriers to Entry:** Costs of manufacture, intellectual property, and expenses related to regulatory oversight are barriers to entry. Barriers to entry increase a market's susceptibility to a coordinated effort to maintain supracompetitive prices because it is difficult for new suppliers to enter the market and destabilize coordinated supracompetitive prices.

110.    As the dominant players in the generic Propranolol market, Defendants were able to fix, raise, and maintain their prices for generic Propranolol without competitive threats from rival generic drug manufacturers.

111.   **Lack of Substitutes:** Many patients are unable to substitute other medications for Propranolol.

112.   **Demand Inelasticity:** "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline, if any, in the quantity sold of that product. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase the product despite the price increase.

113.   For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

114.   Demand for Propranolol is highly inelastic because it is a unique product for which there is no reasonable substitute. Propranolol is a necessary treatment for millions of patients for which no substitutes are available. Propranolol is thus particularly susceptible to collusive price fixing as price increases will not result in such a loss of sales as to reduce profits, but instead will result in more profits for cartel members.

115.   **High Degree of Interchangeability:** Propranolol is a commodity product. Therefore, Defendants' products are interchangeable, as they contain the same chemical compounds made from the same raw materials and are therapeutically equivalent. This characteristic facilitates collusion because cartel members can more easily monitor and detect deviations from a price-fixing agreement. In addition, because these are commodity products, all Defendants had to raise prices for the cartel to work. Indeed, it was against a Defendant's

individual economic interest to raise prices since the other Defendants could have priced below that Defendant's price and taken substantial market share.

116.    **Opportunities for Contact and Communication Among Competitors:** Defendants are members of the trade association GPhA, and attend other industry events and meetings, which provide opportunities to communicate. Defendants' representatives regularly attended meetings of GPhA, including meetings in 2013 and 2015, and meetings of other trade associations during the Class Periods. Indeed, the DOJ is reportedly analyzing trade associations like GPhA as a potential avenue for facilitating collusion between different generic drug manufacturers as part of its years-long investigation into anticompetitive pricing activities among them.

## DEFENDANTS' PRICE INCREASES ARE AGAINST  THEIR UNILATERAL SELF-INTEREST AND ARE UNLIKELY TO HAVE OCCURRED ABSENT A CARTEL

117.    Propranolol is a commodity product. Therefore, absent a cartel, if any manufacturer increased the price of generic Propranolol, it would be expected that its competitors would not increase the price but would seek to sell more Propranolol to the first manufacturer's customers. Accordingly, it would not be in any manufacturer's unilateral self-interest to increase the price of the generic Propranolol it sold unless it had an agreement with the other manufacturers that they would do the same.

118.    During the Class Periods, there was no significant increase in the costs of making Propranolol, no significant decrease in supply, and no significant increase in demand. Nonetheless, there were extraordinary increases by each of the Defendants in the prices they charged their customers for generic Propranolol. Such price increases in a commodity product for which there were no significant increases in costs or demand and no significant decrease in

37

supply would not have been in each Defendant's unilateral self-interest absent the existence of a cartel.

## DEFENDANTS' ANTITRUST VIOLATIONS

119.    During the Class Periods, the Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize the prices of generic Propranolol in the United States.

120.    In formulating and effectuating the contract, combination or conspiracy, the Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the price of generic Propranolol sold in the United States. These activities included the following:

a.      Defendants participated in meetings and/or conversations to discuss the price of generic Propranolol in the United States;

b.      Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Propranolol sold in the United States;

c.      Defendants agreed during those meetings and conversations to fix the price of generic Propranolol; and

d.      Defendants issued price announcements, customer bids, and price quotations in accordance with their agreements.

121.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

122.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiff and members of the Classes purchased generic Propranolol from Defendants (or their

subsidiaries or controlled affiliates) or their co-conspirators at inflated and supracompetitive prices.

123.    Defendants' contract, combination, or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various states.

124.    As a result of Defendants' unlawful conduct, Plaintiff and the other members of the classes have been injured in their business and property in that they have paid more for generic Propranolol than they would have paid in a competitive market.

125.    The unlawful contract, combination or conspiracy has had the following effects, among others:

a.    price competition in the market for generic Propranolol has been artificially restrained;

b.    prices for generic Propranolol sold by the Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

c.    purchasers of generic Propranolol from the Defendants have been deprived of the benefit of free and open competition in the market for generic Propranolol.

## CLASS ACTION ALLEGATIONS

126.    Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

All persons and entities in the United States and its territories who purchased, paid, and/or provided reimbursement for some or all of the purchase price for

Defendants' generic Propranolol capsules and/or tablets from April 18, 2013 and March 18, 2015, respectively, through the present. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Propranolol for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Propranolol were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

127.    Plaintiff also brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states listed below (the "Indirect Purchaser States")[21] on behalf of the following class (the "Damages Class"):

All persons and entities in the Indirect Purchaser States who purchased, paid, and/or provided reimbursement for some or all of the purchase price for Defendants' generic Propranolol capsules and/or tablets from April 18, 2013 and March 18, 2015, respectively, through the present. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Propranolol for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Propranolol were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

---

[21] The "Indirect Purchaser States" consist of Alabama, Arkansas, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

128.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

129.    While Plaintiff does not know the exact number of the members of the Classes, Plaintiff believes there are millions of members in each Class.

130.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize prices of generic Propranolol;

b.    The identity of the participants of the alleged conspiracy;

c.    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

e.    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

f.    Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

41

g.    Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

h.    The effect of the alleged conspiracy on the prices of generic Propranolol sold in the United States during the Class Periods;

i.    The appropriate injunctive and related equitable relief for the Nationwide Class; and

j.    The appropriate class-wide measure of damages for the Damages Class.

131.    Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Propranolol purchased indirectly from the Defendants and/or their co-conspirators.

132.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

133.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

134.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously,

efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

135.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## FIRST COUNT
### Violation of Section 1 and 3 of the Sherman Act
### (on behalf of Plaintiff and the Nationwide Class)

136.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

137.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

138.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

139.    During the Class Periods, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to establish a price floor and artificially fix, raise, stabilize, and control prices for generic Propranolol, thereby creating anticompetitive effects.

140.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Propranolol.

141.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated indirect purchasers in the Nationwide Class who purchased generic Propranolol have been harmed by paying inflated, supracompetitive prices for generic Propranolol.

142.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

143.    Defendants' conspiracy had the following effects, among others:

a.      Price competition in the market for generic Propranolol has been restrained, suppressed, and/or eliminated in the United States;

b.      Prices for generic Propranolol provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

c.      Plaintiff and members of the Nationwide Class who purchased generic Propranolol indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

144.    Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Propranolol purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

145.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

146.   Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND COUNT
### Violation of State Antitrust Statutes
### (on behalf of Plaintiff and the Damages Class)

147.   Plaintiff repeats the allegations set forth above as if fully set forth herein.

148.   During the Class Periods, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of generic Propranolol in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

149.   The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain artificially supracompetitive prices for generic Propranolol.

150.   In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price generic Propranolol at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to generic Propranolol provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

151.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of generic Propranolol.

152.     Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

153.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-6-60, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for generic Propranolol was restrained, suppressed, and eliminated throughout Alabama; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alabama; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Alabama commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Alabama Code § 6-6-60, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Alabama Code § 6-6-60, *et seq*.

154.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, §§ 44-1401, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for Propranolol was restrained, suppressed, and eliminated throughout Arizona; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Arizona

commerce. As a direct and proximate result of defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

155.    Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code §§ 16700 *et seq*. During the Class Periods, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code Section §16720. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of generic Propranolol at supracompetitive levels. The aforesaid violations of Section 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Propranolol. For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Propranolol. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Propranolol has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Propranolol provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive

levels in the State of California and throughout the United States; and (3) those who purchased generic Propranolol directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property in that they paid more for generic Propranolol than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

156.    Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated §§ 28-4501, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Propranolol that were shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Propranolol in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Propranolol, including in the District of Columbia. During the Class Periods, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of defendants' unlawful conduct,

Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

157.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

158.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*). Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Generic

Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

159.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553, *et seq.*

160.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, §§ 50-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained,

suppressed, and eliminated throughout Kansas; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

161.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.). Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Maine; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat.

Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

162.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

163.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes §§ 325D.49, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

164. Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq*.

165. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Defendants' combinations or

conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

166. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into

agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

167.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

168.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff

and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

169.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws §§ 340, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout New York; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol that were higher than they would have been absent the Defendants' illegal acts. During the Class Periods, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

170.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

171.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct,

Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

172.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

173.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Generic Propranolol prices were raised,

fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

174.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*.

Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

175.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Utah; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

176.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

177. Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

178. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq*. Defendants' combinations or conspiracies

had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

179.    Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiff and members of the Damages Class have paid more for generic Propranolol than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

180.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiff and members of the Damages Class.

181.    Accordingly, Plaintiff and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or

otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD COUNT
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiff and the Damages Class)**

182.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

183.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

184.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Propranolol was sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff

63

and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

185.   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Periods, Defendants manufactured, marketed, sold, or distributed generic Propranolol in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.* of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and

whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Propranolol in the State of California within the meaning of Section 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Propranolol. Plaintiff and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

186.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic Propranolol was sold, distributed, or obtained in the District of Columbia. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiff and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for generic Propranolol. Defendants had the sole power to set that price and Plaintiff and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing generic Propranolol because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Propranolol, including their illegal conspiracy to secretly fix the price of generic Propranolol at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic Propranolol. Defendants' unlawful conduct had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia;

(3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. As a direct and proximate result of the Defendants' conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

187.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Florida; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

188.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et*

*seq*. Defendants' unlawful conduct had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

189.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq*. Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Propranolol was sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11. Defendants' unlawful conduct had the following effects: (1) Generic Propranolol price

competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11, that were knowing or willful, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute, including multiple damages.

190.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.* Plaintiff and members of the Damages Class purchased generic Propranolol for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of generic Propranolol in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic Propranolol was sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff and members of the Damages Class

concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of generic Propranolol they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Propranolol by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of generic Propranolol were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing generic Propranolol at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15

CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

191.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq*., and §§ 30-14-201, *et. seq.* Defendants' unlawful conduct had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Montana; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants marketed, sold, or distributed generic Propranolol in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq*., and §§ 30-14-201, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

192.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Propranolol was sold, distributed, or obtained in New Mexico and took efforts to conceal their

agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiff and members of the Damages Class and the prices paid by them for generic Propranolol as set forth in N.M.S.A., § 57-12-2E. Plaintiff and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for generic Propranolol. Defendants had the sole power to set that price and Plaintiff and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing generic Propranolol because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Propranolol, including their illegal conspiracy to secretly fix the price of generic Propranolol at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Propranolol. Defendants' unlawful conduct had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels

throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

193.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol was sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Propranolol that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Propranolol; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Propranolol were misled to believe that they were paying a fair price for Propranolol or the price increases for generic Propranolol were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

Defendants knew that their unlawful trade practices with respect to pricing generic Propranolol would have an impact on New York consumers and not just the Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Propranolol would have a broad impact, causing consumer class members who indirectly purchased generic Propranolol to be injured by paying more for Propranolol than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout New York; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants marketed, sold, or distributed generic Propranolol in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Periods, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold, and/or distributed Propranolol in New York. Plaintiff and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

194.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants

agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol was sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Propranolol created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

Propranolol. During the Class Periods, Defendants marketed, sold, or distributed generic Propranolol in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Periods, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold, and/or distributed Propranolol in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

195.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1, *et seq.*) Members of this Damages Class purchased generic Propranolol for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol was sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Periods that Defendants' Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following

effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of generic Propranolol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

196. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, *et seq.*). Defendants' combinations or conspiracies had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiff and members of the Damages

Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq*., and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

197.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol was sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Periods that Defendants' Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Generic Propranolol price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the

Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

## FOURTH COUNT
**Unjust Enrichment**
**(on behalf of Plaintiff and the Damages Class)**

198.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

199.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on generic Propranolol.

200.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and members of the Damages Class for generic Propranolol manufactured and/or sold by Defendants during the Class Periods.

201.    Plaintiff and members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.

Plaintiff and members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a *pro rata* basis.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment that:

1.      The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

3.      Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

4.      Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5.      Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.      Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

7.      Plaintiff and members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8.      Plaintiff and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: January 10, 2017                                Respectfully submitted,

By: _____
Brent W. Landau
Gary I. Smith, Jr.
HAUSFELD LLP

81

325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: 215-985-3270
Fax: 215-985-2371
Email: blandau@hausfeld.com
Email: gsmith@hausfeld.com

Michael P. Lehmann
Bonny E. Sweeney
Christopher L. Lebsock
Stephanie Y. Cho
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
Email: mlehmann@hausfeld.com
Email: bsweeney@hausfeld.com
Email: clebsock@hausfeld.com

Michael D. Hausfeld
Sathya S. Gosselin
Jeannine M. Kenney
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
Email: mhausfeld@hausfeld.com
Email: sgosselin@hausfeld.com
Email: jkenney@hausfeld.com

Lee Albert
Gregory B. Linkh
GLANCY PRONGAY & MURRAY LLP
122 E. 42nd Street
Suite 2920
New York, NY 10168
Telephone: (212) 682-5340
Fax: (212) 884-0988
Email: lalbert@glancylaw.com
Email: glinkh@glancylaw.com

Frank R. Schirripa
Daniel B. Rehns
HACH ROSE SCHIRRIPA & CHEVERIE LLP
185 Madison Avenue
New York, New York 10016
Tel: (212) 213-8311
Email: fschirripa@hrsclaw.com
Email: drehns@hrsclaw.com

*Counsel for Plaintiff*